RECEIVED
USDC CLERK, CHARLESTON, SC

2007 FEB 28  A 9: 57

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Daniel T. Stopka, )<br><br>     Plaintiff, )<br><br>    -versus- )<br><br>Medical University of South )<br>Carolina and Medical )<br>University Hospital Authority,)<br><br>    Defendants. ) | C. A. No. 2:05-1728-CWH-RSC<br><br>**REPORT AND RECOMMENDATION** |

This Americans with Disability Act (ADA) action with pendent
state claims is before the undersigned United States Magistrate
Judge for a Report and Recommendation on the defendants' motion
for summary judgment. 28 U.S.C. §636(b)(2)(i).

The plaintiff, Daniel T. Stopka (Stopka), filed this action
against the defendants Medical University of South Carolina
(MUSC) and Medical University Hospital Authority (MUHA)[1],
(collectively the defendants), on June 23, 2005.  His complaint
includes federal and state claims of employment discrimination in
violation of Title I of the ADA, 42 U.S.C. § 12111-12117, and
South Carolina Code Section 43-33-530, a federal claim for
retaliation in violation of the ADA, a state claim for breach of

---

[1]  Defendants took the position that MUSC is the only proper
defendant and Plaintiff agreed that the action should be against
MUSC alone.  Therefore, MUHA should be dismissed and the action
proceed only against MUSC.

an employment contract, and a state claim for discharge from employment in violation of public policy.[2]  Stopka seeks damages and equitable relief.

Discovery is complete and a hearing on the pending dispositive motion was held on October 24, 2006.  Hence, it appears that consideration of the motion is appropriate.

## SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact."  Fed.R.Civ.P. 56(c).  The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial.  Celotex Corp. v. Cattrett, 477 U.S. 317 (1986).  All evidence should be viewed in the light most favorable to the non-moving party.  Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute

---

[2] Plaintiff agreed to dismiss this cause of action.

2

exists.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 574, 586-87 (1986).  "[W]here the record taken as a whole
could not lead a rational trier of fact to find for the non-
moving party, disposition by summary judgment is appropriate."
Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115,
119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248-49 (1986).  Unsupported speculation is not enough to
withstand a motion for summary judgment.  Ash v. United Parcel
Service, Inc., 800 F.2d 409, 411-12 (4th Cir. 1986).

### FACTS

Plaintiff Stopka was a medical school student at Finch
University of Health Sciences/Chicago Medical School when he was
injured in a fall in May 1998.  He suffered a brain injury which
resulted in a visual impairment and slower mental processing
speed.

Despite the plaintiff's injuries, he endeavored to complete
medical school and returned to school within approximately one
year of his injury.  He had to start by initially taking only
one class and then he slowly worked his way back into a full
schedule.[3]  This resulted in a longer period of time to complete
medical school.

Stopka's medical school provided him with accommodations for

---

[3]Stopka depo. Pg. 30, lines 14-25; pg. 31, lines 1-19

his disability.  He was allowed to carry a patient load of 1/2 of the other medical students and he was given extra time to do course work[4] and testing[5].  With those accommodations, the plaintiff successfully completed medical school.  As is required of all students, the plaintiff took the Physician Licensing Exam. This test is a prerequisite for being licensed.  The first time he took the test, he was allowed three times the amount of time allotted other students to complete the test.  That additional time proved not to be an adequate accommodation.  Subsequently the plaintiff received an accommodation which would allow him more time to take the test, and he was able to pass the physician licensing exam with the requested accommodation.[6]

After passing the licensing examination, Stopka sought to enroll in a residency program.  Residency candidates are matched with teaching hospitals through a computerized matching system, and one may only accept assignments made by the computer match. Furthermore students who do not accept the computerized match are fined and not allowed to participate in the match for a residency

---

[4]Stopka depo. Pg. 32, lines 2-21; Alvarez depo page 27, lines 7-18; Page 134, lines 20-25; page 135, lines 1-25

[5]Alvarez depo. Pg. 27, lines 7-11; Page 136, lines 18-25

[6]Stopka depo. Pg. 151, line 23

again for several years.[7]  Without a residency being completed,
doctors have little chance of being licensed as any type of
clinical physician who treats patients.

In the plaintiff's application for residency, he indicated
he needed special accommodations due to his injury, stating he
had problems with reading and processing speed. (Ex. 3, ERAS 2003
Application).[8]  However independent examinations as well as
examinations performed for the defendants have indicated this
disclosure minimized his limitations.[9]  Also attached to the
plaintiff's application for residency was a letter of
recommendation from the Dean of Chicago Medical School, Jan
Reese, M.Ed.  In that letter Dr. Reese indicates that during
medical school, Stopka maintained an active membership in the
American Medical Association.  Dr. Reese stated that although the
plaintiff required more time to prepare for the licensing exam in
order to compensate for his deficit, with accommodating time to
take his exam, he passed the examination in May 2001.  Further

---

[7]  Johnson depo. Page. 9, lines 8-25; 10, lines 1-13, Page
10, lines 14-20

[8]Stopka depo. Page 354, lines 2-5

[9]Defendants' Exhibit E (Report of Dr. Teichner), Exhibit F
(Report of Dr. 16 Beaver), Larson Dep., de bene esse, at 62, l.
2-19; and Landre Dep. at 39, l. 21 - p. 40, l. 6.

.

the Dean stated that in the plaintiff's third year, he completed his clinical rotations in Obstetrics/Gynecology, Surgery, Emergency Medicine, Neurology, Pediatrics, Psychiatry, and Family Medicine.  Throughout the Dean's letter, it indicates that the plaintiff was a very capable and motivated student and that his overall performance was good.  Dr. Reese indicated that the plaintiff was able to work through major obstacles and adjust to his disability through determination and dedication, as well as accommodations including an altered schedule and extended time for tests.  Dr. Reese stated that, "Dan has persevered and overcome his disability to pursue his dream of providing effective health care."  According to Dr. Reese's letter, Stopka "performed at a good level in comparison to his peers at The Chicago Medical School."[10]

Stopka also discussed the issue of his disability in his interview with MUSC during the match process.[11]  Dr. George Johnson, MUSC's Pediatric Residency Program Director, interviewed Stopka and was made aware of Stopka's limitations and problems

---

[10]  For the purposes of the current summary judgment motion, this letter is clearly hearsay and not appropriate to prove the truth of the matters stated in the letter. However it is recited here to show the mental impression of the defendants when considering the plaintiff as a residency candidate. See Rule 56(e), Federal Rules of Civil Procedure.

[11] Johnson depo. Page 11, lines 2-9; Stopka depo. Page 354, lines 2-5

with slower reading and mental processing skills.  Soon after the interview, the computer matched Stopka with the Medical University of South Carolina for his residency.  On May 20, 2003, Plaintiff signed a contract of employment prepared by the Medical University of South Carolina.[12]

When Dr. Stopka started his residency at MUSC, he was placed into the normal rotation without accommodations.[13]  However, he requested assistance in reading medical records, books, and notes with a scanning device, but no scanning device was provided to him by MUSC, nor did he obtain one on his own.  The plaintiff asserts that devices such as the Kurzweil 1000 manufactured by Kurzweil Technologies, and OpenBook, manufactured by Freedom Scientific, were available and would have benefitted him and were relatively inexpensive at just under one thousand ($1,000) dollars.

The plaintiff's first rotation ran from July 1, 2003, through July 31, 2003, in the Neonatal Intensive Care Unit.  His performance during this rotation was described as marginal.  The second rotation ran from August 1, 2003, through August 31, 2003, in the Emergency Room of MUSC, and his performance was again rated as marginal.  The third rotation ran from September 1, 2003, through September 30, 2003, on the Ward Team III.

---

[12]Stopka depo, Page 46, lines 6-16

[13]Johnson depo. Page 12, lines 14-17

7

During the third month of his residency, despite receiving informal assistance with his patient load from some of the other residents, the plaintiff began to fall behind. (Ex. 6).  He received two evaluations for this rotation, one marginally passing and one unsatisfactory.  Also during the third rotation, the plaintiff began having academic problems.

During the fourth rotation, despite receiving accommodations in the form of an approximately eighty (80%) percent lower patient load than the other residents, and direct supervision and assistance, the plaintiff was unable to perform satisfactorily. He received an unsatisfactory on the fourth rotation and the supervising resident affied that Stopka "has lost or is unable to retrieve the basic medical knowledge he should have gained in medical school;" was "functioning at a level below a third-year medical student at the least;" had "extreme difficulty in memory and retention of learning,"; "has extreme difficulty in making decisions or rounding up necessary information to make decisions," and "at times, he failed to even discuss or disclose when he was unsure of what to do about a situation with me or someone who could have helped;" and he "doesn't know how severe his detriment is" and "seems to be in denial of the seriousness of the issue".[14]

---

[14] Defendants' Exhibit O (Lipscomb affidavit ).

8

Still this was not academically fatal to his residency because he had three passing evaluations and two unsatisfactory evaluations.

Eventually the plaintiff was directed to Dr. Teichner for a neuropsychological evaluation for Dr. Johnson. Dr. Teichner did the testing on October 3, 2003. The results indicated that Plaintiff had significant cognitive deficits that materially impaired his memory and his executive functions, particularly those involved in higher-level thinking and problem solving.[15]

On November 3, 2003, the plaintiff was to be given an accommodation by starting a rotation out of turn with Dr. Janice Key, who could provide closer supervision, a reduced patient case load, and assistance with his learning disabilities.[16] However, the plaintiff did not report for the scheduled rotation. Subsequently the plaintiff met with Dr. Johnson and requested leave so that he could attend interviews for another residency program at a different hospital.

His fifth rotation was with Dr. Ben Clyburn. This rotation was also to include close supervision by Dr. Clyburn and reduced responsibilities. The plan was to determine the extent to which any accommodations would enable the plaintiff to eventually

---

[15] Defendants' Exhibit E (Teichner Report).

[16] Janice Key Dep.at 6, l. 7 - p. 10, l. 24, .

perform at the level of a competent physician.[17]  The plaintiff requested additional leave during Christmas break from Dr. Johnson so that he could interview at other schools, and such leave was granted.  The result was to avoid his rotation with Dr. Key and any accommodations planned there and to cut short his rotation with Dr. Clyburn and the accommodations made for that rotation.

The plaintiff did not return to MUSC until January 20, 2004. On January 28, 2004, MUSC staff held a meeting with Stopka and advised him that his position had been terminated.  This meeting apparently was discordant.  Stopka was subsequently unsuccessful in his attempts to enter another residency program.

The plaintiff asserts that reasonable accommodations could have been made by reducing the plaintiff's patient case load and by providing him assistive reading devices.

## ADA LAW AND DISCUSSION

The ADA prohibits certain employers, including as here, a state, from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  §§

---

[17] Johnson Dep. at 84, l. 6-12; at 88, l. 4-14; Clyburn Dep. at 40, l. 77 16-20.

12112(a), 12111(2), (5), (7).  To this end, the Act requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business."  § 12112(b)(5)(A).

"'[R]easonable accommodation' may include, '(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.'" § 12111(9).

The Act also prohibits employers from "utilizing standards, criteria, or methods of administration ... that have the effect of discrimination on the basis of disability." § 12112(b)(3)(A).

The Act defines "disability" to include "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." § 12102(2).  A disabled individual is otherwise "qualified" if he

11

or she, "satisfies the requisite skill, experience, education and other job-related requirements" and "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8); 29 C.F.R. 1630.2 (m).

Stopka also claims that he was terminated in retaliation for asking for an accommodation in violation of the ADA. See 42 U.S.C.A. § 12203 (providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter").

To establish a prima facie case of retaliation, Stopka is required to present evidence that (1) he "engaged in conduct protected by the ADA;" (2) he "suffered an adverse action subsequent to engaging in the protected conduct;" and (3) "there was a causal link between the protected activity and the adverse action." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002).

Stopka seeks damages for the alleged vioaltions of the ADA. Recently, the Supreme Court found that Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I of the ADA, Board of

12

<u>Trustees of University of Alabama v. Garrett</u>, 531 U.S. 356, 121
S.Ct. 955 (2001). As a result, Plaintiff here cannot proceed to
the extent he seeks damages from the defendants[18] under Title I
of the ADA.

However, although damages are barred, Plaintiff can seek
injunctive relief from the state under <u>Ex parte Young</u>, 209 U.S.
123, 28 S.Ct. 441 (1908). <u>See</u>, <u>Garrett</u>, 531 U.S. at 374 (FN 9),
121 S.Ct. at 968). Plaintiff's sixth prayer for relief, "Order
that Defendants reasonably accommodate plaintiff's disabilities,"
seeks permissible prospective equitable relief from the
defendants, which relief is not barred by <u>Garrett</u>.

Nonetheless, it appears that the defendants are entitled to
summary judgment on the ADA causes of action seeking equitable
relief. Here, Plaintiff is not a "qualified individual with a
disability" since he cannot perform the "essential functions" of
resident's position, and there exists no "reasonable
accommodation" that would enable him to do so.

The primary function of the resident physician position such
as that held by Plaintiff, is to provide competent medical care
to patients. The question becomes whether there was any

---

[18] Defendants in the present case are agencies of the state
of South Carolina. <u>See</u>, S.C. Code Ann. § 59-123-10 et. seq.; and
<u>Med. Soc. of South Carolina v. Med. Univ. Of South Carolina</u>, 513
S.E.2d 352(S.C. 1999)(medical university is a unique state
agency). <u>See also</u>, S.C. Code Ann. § 59-123-60 (establishing
Medical University Hospital Authority as a separate State
entity).

reasonable accommodation which would have enabled Plaintiff to perform competent patient care and, ultimately, whether MUSC complied with the reasonable accommodation requirements of the ADA.

The burden of identifying an accommodation that would allow a qualified individual to perform the job rests with the plaintiff, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. Halperin v. Abacus Tech. Corp., 128 F.3d 191 (4th Cir. 1997); Tyndall v. Nat'l. Educ. Ctrs, 31 F.3d 209, 213 (4th Cir. 1994)(Plaintiff bears the burden of demonstrating that he could perform the essential functions of his job with reasonable accommodation).

Nonetheless, even if a plaintiff can meet that burden and show that a reasonable accommodation exists, an employer can still prevail by showing that plaintiff's requested accommodation imposes an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); Willis v. Conopco, Inc., 108 F.3d 282, 284-86 (11th Cir. 1997). To prevail, a plaintiff must show that he is "able to meet all of a program's requirements in spite of his handicap." Halperin at 197.

Here, Stopka has not offered any evidence that there exists any such reasonable accommodation that would have enabled him to provide competent patient care. Stopka even admitted that, for

14

most of his employment, he himself "did not know the extent of [his] cognitive issues." The defendants cannot be liable for an alleged failure to accommodate a disability the extent of which it was not aware. See, Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1134-35 (7th Cir. 1995).

Plaintiff's treating psychiatrist deposed that the "accommodation" that Plaintiff would need to perform as a resident would be someone to perform his job for him: "Q: In the average residency program, he would not have been able to make it through without somebody basically doing his job for him?  A: Yeah."[19]  This is consistent with the observations of the various supervisors, such as Dr. Joseph Lipscomb, who observed that Stopka made errors such as prescribing the wrong medication for patients and, thus, required constant supervision over everything he did to avoid patient harm.[20]  It also is consistent with the reports of Gordon Teichner, the neuropsycholgist who examined Stopka at the time of his discharge, and Craig Beaver, another neuropsychologist who examined Stopka at the request of the defendants.[21]

The ADA does not require an employer to hire an additional

---

[19] Inan Dep. at 94, l. 14-17.

[20] Def. Ex. O Lipscomb aff.

[21] Def. Ex. E Teichner report at 9-10; Ex. F Beaver report at 25-26.

person to perform an essential function of a disabled employee's position. Martinson v. Kinney Shoe Corp., 104 F.3d 683 (4th Cir. 1997); Lusby v. Metropolitan Washington Airport Auth., 187 F.3d 630 (4th Cir. 1999)(unpublished); Hansen v. Henderson, 233 F.3d 521, 523 (6th Cir. 2000)(Hospital not required to hire a helper to do the aspects of nurse's essential functions that she could not perform); Milton v. Scrivner, Inc., 53 F.3d 1118 (10th Cir. 1995)(ADA not intended to force employer to subsidize disabled employees by keeping them in their paid positions while still having to hire someone else to actually do their jobs).

Plaintiff contends that he could have handled the essential functions of the job if he were only required to perform them for some patients while another resident took over the remainder of his patient load for him.  That is no different than hiring someone to help with all of his patients.  "It is well settled that an employer need not accommodate a disability by foregoing an 'essential function' of the employment position." Laurin v. Providence Hosp., 150 F.3d 52, 55 (1st Cir. 1998).  A "request to perform only some of the essential functions of a job is not a request for reasonable accommodation." Id. (quoting prior case law).  Here, in fact, the program did try to accommodate Stopka by drastically lowering his patient load, but all evaluations of his work by his supervisors reveal that he could not perform the essential function of his residency even then.  Plaintiff's

16

medical school teacher testified that, even with the much lower
level of responsibility that a student has during patient
rotations, Plaintiff was never able to successfully follow more
than a single patient per day.[22]  Even if the defendants had
limited Stopka to responsibility for a single patient, a
reasonable finder of fact could not conclude that the medical
university is required by the ADA to limit the resident who
shares actual patient care with other doctors to one patient per
shift.

In addition to the radically lowered patient load, the
plaintiff believes that his requested transfer to another
residency program would have been a reasonable accommodation.  It
appears that he is incorrect.  First, there is no evidence that
Plaintiff requested such a transfer within the program, as
opposed to discussing his desire to leave and go to another
employer altogether.  Second, while a transfer to another
position can be a reasonable accommodation, that is moot here
since a transfer to any other residency slot would have been
subject to the same central problem that Plaintiff cannot perform
the essential functions of a resident doctor.

Further, Plaintiff admits that he could not do even that
unless MUSC first put him through a remediation program which
would relieve him of his resident responsibilities and put him in

---

[22] Alvarez Dep., Vol. II, at 30, l. 11 - p. 35, l. 16.

17

a student status to make up for things he says he failed to learn in medical school.  Plaintiff's suggested accommodation is unavailing because to be a "qualified" individual with a disability, a plaintiff is required to show that he already possesses the necessary skills and education to perform the essential functions of the position. 29 C.F.R. § 1630(m). Providing training or education for an employee who does not meet that requirement is not required as a reasonable accommodation which an employer is required to provide.  The ADA does not require employers to offer special training to disabled employees.  It is not an affirmative action statute in the sense of requiring an employer to give preferential treatment to a disabled employee merely on account of the employee's disability. Williams v. United Ins. Co. of America, 253 F.3d 280 (8th Cir. 2001).  The burden that would be placed on employers if disabled persons could demand special training to fit them for new jobs would be excessive and is not envisaged or required by the Act. The duty of reasonable accommodation may require the employer to reconfigure the workplace to enable a disabled worker to cope with his disability, but it does not require the employer to reconfigure the disabled worker. Id.  In short, none of Stopka's proposed accommodations are "reasonable" within the meaning of the ADA.

Additionally, those proposed accommodations would not be

18

required by the ADA because (1) they would place an "undue hardship" on the program; and (2) Plaintiff's continued employment presented a "direct threat" of harm to others.  The hardship issued was highlighted by Dr. Kraveca during Plaintiff's rotation in Ward III.  On one particular night in the rotation, seven or eight new patients were admitted.  Normally, a single resident would have been assigned to all of those patients, but Plaintiff was on duty and he could handle only three or four patients.  Ward III had to seek help from another resident who was on call.  While that is a possible "accommodation" on an occasional basis, on a continuous basis the other residents become overworked to the point that they cannot function which, in turn, becomes a patient care issue.  Dr. Kraveca sent an e-mail to various program supervisors, including the program director, George Johnson, expressing her concern at the unit's ability to sustain Stopka's lowered patient load without undue burden and potential patient care issues.[23]  Likewise, when Stopka was on his rotation in Ward I, Dr. Lipscomb felt that the extreme measures that were necessary to supervise Stopka were working to the disadvantage of the other residents.[24]  That concern was echoed by the residents on Dr. Clyburn's ward, internal medicine, during Stopka's December rotation.

---

[23] Ex. L, E-mail from Kraveka to Brown dated 9/9/03.

[24] Ex. O, Lipscomb aff.

Most importantly, the evidence is that permitting Stopka to continue as a resident presented a direct threat of harm to others, which is not required by the ADA. 29 C.F.R §§ 1630.15(b)(2); and 1630.2(r). Both of the psychiatrists who treated Stopka, Drs. Hunt and Inan, testified that they would not want a physician with his cognitive deficits.[25] All of the individuals who evaluated and supervised Stopka voiced concerns related to potential for compromised patient care.[26] Gordon Teichner, the neuropsychologist who examined Stopka just prior to his discharge, assessed him as having significant "permanent" cognitive deficits which would affect his "ability to complete any residency program and to competently practice as a physician." Dr. Teichner said he was concerned about "how [Plaintiff's] deficits may affect patient care." [27] Dr. Craig Beaver, an examining neuropsychologist, gave a report which confirmed Dr. Teichner's findings and offered a similar opinion. Although Dr. Beaver felt that Plaintiff's impairments might have been capable of accommodation in an academic setting, the permanent problems he had would make it impossible to provide any

---

[25] Hunt Dep. at 30, l. 1-7; Inan Dep. at 74, l. 18 - p. 75, l. 25).

[26] See, Ex. I, K, M, N, P (rotation evaluations); Ex. S (Clyburn assessment); Ex. O (Lipscomb aff.); see also, attachments to Teichner Report at Ex. E (additional supervisor and peer observations).

[27] Ex. E.

accommodation that would enable him to competently perform the functions of a resident or a physician.[28]  The two neuropsychologists who examined Plaintiff at his request during medical school both formed the opinion, even after very limited examinations, that he had impairments which would impact his ability to perform as a physician.[29]

In short, every expert who has examined or treated Plaintiff and every supervising doctor who had an opportunity to observe Plaintiff actually practicing as a resident, agreed that Plaintiff is not competent to practice medicine without posing a risk of compromised patient care.  Stopka has offered no evidence to the contrary except his medical school teacher who can attest that Plaintiff performed satisfactorily as a student so long as he was never required to follow more than one patient a day. Student performance and performing the essential functions of a resident physician are so dissimilar that no genuine and material fact issue is created by the teacher's opinion.  As a result, the defendant is entitled to judgment as a matter of law on Plaintiff's failure to accommodate claim.

Plaintiff also brought a cause of action under the ADA in which he asserted that he was retaliated against by his employer

---

[28] Ex. F.

[29] Landre Dep. at 18, l. 11 - p. 19, l. 22; Larson de bene esse Dep. at 86, l. 4 - p. 88, l. 23.

because he asked for an accommodation.  Plaintiff's complaint does not properly allege the elements of ADA retaliation.  It fails to allege that his discharge was related to his request for accommodation.  Rather, this retaliation claim is a rehash of his failure to accommodate claim.  Paragraph 33 of the complaint asserts that Plaintiff asked for accommodations.  However it thereafter alleges that, "Defendants refused to accommodate his disabilities, terminated Plaintiff's position and caused him to lose pay and benefits, including but not limited to health benefits in retaliation for his medical disability."  This language does not state a claim for retaliation, but only restates the basic ADA claims.

Additionally, there is no evidence that the defendant fired Plaintiff because he requested an accommodation.  The only claim is that he was denied further accommodations and discharged because of his disability.  This distinction is one that separates a discrimination claim from a retaliation claim.  The retaliation cause of action should be dismissed.

### CAUSES OF ACTION UNDER SOUTH CAROLINA LAW

If this report and recommendation is accepted and the court decides to dismiss the two ADA causes of action, then it is further recommended that court use its discretion to decline to exercise supplemental jurisdiction over the remaining claim outside its original jurisdiction and dismiss without prejudice

the state law cause of action. 28 U.S.C. § 1367(c)(3).

## CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended that the defendants be granted summary judgment on Plaintiff's two ADA causes of action and Plaintiff's remaining state claim be dismissed without prejudice.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina

February **28**, 2007